**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| GINA MARIE COWGILL, ) | CASE NO. 5:10-cv-1425 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE VECCHIARELLI |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | **MEMORANDUM OF OPINION** |
| ) | |
| Defendant. ) | |

This case is before the magistrate judge by consent. Plaintiff, Gina Marie Cowgill ("Cowgill"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Cowgill's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423 and 1381(a). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the court **AFFIRMS** the opinion of the ALJ and dismisses the complaint with prejudice.

I. Procedural History

Cowgill filed an application for SSI on February 28, 2006, alleging disability since she was two months old on July 1, 1984. Her application was denied initially and upon

reconsideration. Cowgill timely requested an administrative hearing.

Administrative Law Judge Deborah Arnold ("ALJ") held a hearing *via* teleconference on November 21, 2008. Cowgill, represented by counsel, testified on her own behalf at the hearing. Gene Burkhammer testified as a vocational expert ("VE"). The ALJ issued a decision on October 27, 2008 in which she determined that Cowgill is not disabled. Cowgill requested a review of the ALJ's decision by the Appeals Counsel. When the Appeals Counsel declined further review on May 24, 2010, the ALJ's decision became the final decision of the Commissioner.

Cowgill filed an appeal to this court on June 28, 2010. Cowgill alleges that the ALJ erred in finding that she is not disabled because the ALJ erroneously rejected the opinion of Cowgill's treating physician regarding Cowgill's limitations. The Commissioner denies that the ALJ erred.

II. Evidence

*A.    Personal and vocational evidence*

Cowgill was born on May 2, 1984. She has a GED and no past relevant work experience.

*B.    Medical Evidence*

On February 1, 2006, Ikem Nkangmiene, M.D., Cowgill's treating psychiatrist, examined Cowgill at the New Horizon psychiatric services facility in Canton, Ohio. Transcript ("Tr."), p. 236. Cowgill reported that she felt "run down & tired all the time" and experienced mild anxiety. She also reported that she had been off her medications for a year. Dr. Nkangmiene noted a family history of depression and diagnosed Cowgill as

2

suffering from a recurrent major depressive disorder. He assigned Cowgill a Global Assessment of Functioning ("GAF") of 50[1] and prescribed counseling, Xanax, Lexapro, and Lamictal.

Cowgill saw Dr. Nkangmiene again on February 8, 2006. Tr. at 236. Dr. Nkangmiene noted reduced concentration and unstable mood. On her March 8, 2006 visit, Cowgill reported multiple audio or visual hallucinations and paranoia. Tr. at 235. Dr. Nkangmiene continued Xanax and Lamictal and added Risperdal. Cowgill reported on April 12, 2006 that the Risperdal helped with the auditory hallucinations. Tr. at 2234. She also reported headaches, and Dr. Nkangmiene reduced the dosage of Lamictal in response. Cowgill reported improvement on May 16, 2006, and Dr. Nkangmiene continued her medications. Tr. at 233.

On June 12, 2006, Dr. Nkangmiene reported that Cowgill was doing well, was moving back with her boyfriend, and was happy. Tr. at 232. He found Cowgill to be stable. During Cowgill's July 10, 2006 visit, she reported that she had no job as yet because of stress and anxiety. Tr. at 231. According to Cowgill, she was "not a people person." *Id.* Dr. Nkangmiene noted that she was stable and "doing okay." *Id.*

On June 26, 2006, Ruth Haude, Ph.D., interviewed and evaluated Cowgill at the request of the Bureau of Disability Determination ("the Bureau").[2] Tr. 166-75. Dr, Haude

---

[1] A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning.

[2] As Cowgill notes in her merit brief, except for the caption on the first page, Dr. Haude referred to Cowgill as "Miss Smith" throughout her assessment. A reading of the assessment makes clear that the use of "Miss Smith" was an error and that Dr. Haude was, indeed, assessing Cowgill.

3

found Cowgill to be distant, uncooperative, and passive-agressive. Dr. Haude concluded that Cowgill did not suffer from depression but rather had been so sheltered that she developed dysfunctional behaviors that would have been avoided had she cared for herself and dealt with normal social situations. Dr. Haude described Cowgill as "dependent, manipulative, passive, passive-aggressive, impulsive, oppositional, unwilling to perform in accord with her abilities, and not cooperative." Tr. at 174-75. Dr. Haude also stated that it was impossible to tell if Cowgill displayed these observed behaviors intentionally and tactically. Dr. Haude opined that Cowgill "is well able to understand, remember and carry out instructions with no significant limitations if she so chooses," although she also opined that persistence was a problem. Tr. at 175. Dr. Haude added:

> The writer can present no data to document that [Cowgill] would be unable to withstand the pressures and stresses associated with day-to-day work activity and a normal length work day or workweek. The writer also can provide no data to document that [Cowgill] is interested in employment or motivated to hold employment. It is recommended that [Cowgill] pursue employment not working directly and sustainedly with other people, because her working with other people is unlikely to work out well for her and it is unlikely to work out well for the other people either.

Tr. at 175. In assessing Cowgill's GAF, Dr. Haude diagnosed no clinical disorder on Axis I; found an unspecified personality disorder on Axis II, characterized by passive-aggressive behavior, impulsiveness, passivity, and histrionic, immature, and dependent behavior; and cited responsibilities and compliance with rules and authority as psychosocial stressors. She assigned Cowgill a GAF of 60.[3]

On July 7, 2006, Jennifer Swain, M.D., an agency psychiatrist, completed a

---

[3] A GAF score of 51-60 indicates moderate symptoms or moderate impairment in social, occupational, or school functioning

Psychiatric Review Technique Form evaluating Cowgill on the basis of the record. Tr. at 176-89. Swain found Cowgill to be suffering from dysthymia and an unspecified personality disorder. She opined that Cowgill had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace. Swain found that Cowgill did not meet or medically equal the criteria of the Listings of Impairments, 20 CFR Part 404, Subpart P, Appendix 1 ("the listing"). Swain also completed a Mental Residual Functional Capacity ("MRFC") Assessment. Tr. at 190-93. However, rather than describing Cowgill's residual functional capacity *de novo*, Swain adopted the 2005 decision of the ALJ in Cowgill's earlier application for SSI pursuant to the "*Drummond* ruling." *See Drummond v. Commissioner of Social Sec.*, 126 F.3d 837, 842-43 (6th Cir. 1997) (applying principles of *res judicata* to hold that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances"). Joan Williams, Ph.D., affirmed the opinion expressed in the MRFC. Tr. at 200-04.

Cowgill continued to visit Dr. Nkangmiene for treatment. On August 14, 2006, Dr. Nkangmiene described Cowgill as doing fairly well. Tr. at 222. There was no evidence of disorganization or psychosis, and her cognition, insight, and judgment were good. On September 7, 2006, Dr. Nkangmiene described Cowgill as very sad, and diagnosed severe bipolar disorder and panic disorder. Tr. at 221. Nevertheless, the doctor found Cowgill to be fully oriented with intact cognition, insight, and judgment. Affect was full and mobilizable. He did not observe any agitation or involuntary movements. Dr. Nkangmiene continued Xanax and encouraged counseling with respect to her relationship with her

boyfriend.

On September 13, 2006, Dr. Nkangmiene completed a questionnaire assessing Cowgill at the request of the Bureau.  Tr. at 197-99.  He diagnosed Cowgill as suffering from a severe bipolar disorder and a panic disorder with agoraphobia, resulting in severe impairment of concentration and unstable mood, decreased ability to sustain attention, and inability to function.  He also asserted that Cowgill suffered severe withdrawal and avoidance of social interaction, with daily episodes of decompensation.  According to Dr. Nkangmiene, these symptoms had persisted for 3-4 years with minimal response to treatment.  He averred that Cowgill had been compliant with medication and appointments.  The doctor also opined that Cowgill's ability to tolerate stress was poor but that she was capable of managing her own benefits.

On October 6, 2006, Dr. Nkangmiene again described Cowgill as doing very well.  Tr. at 220.  Affect was full and mobilizable, and there was no evidence of agitation or involuntary movement.  Cowgill's cognition, insight, and judgment were intact.

On October 31, 2006, Cowgill's mother reported that Cowgill exhibited rapid and extreme mood swings and that her medications worked only for brief periods.  Tr. at 219.  The doctor against described Cowgill as having a full affect, exhibiting no evidence of agitation or involuntary movement, and having intact cognition, insight, and judgment.  He assessed Cowgill as being stable.  Dr. Nkangmiene substantially increased her dosages of Xanax, Lamictal, and Risperdal.

On November 28, 2006, Dr. Nkangmiene reported Cowgill upset because she had been turned down for SSI.  Tr. at 218.  He again described her as having a full affect, exhibiting no evidence of agitation or involuntary movement, and having intact cognition,

6

insight, and judgment.  He again assessed Cowgill as being stable.  Dr. Nkangmiene reported that he would try to connect Cowgill with counseling.

Cowgill's mother again reported mood swings on January 31, 2007.  Tr at 217.  Cowgill's mother also opined that Cowgill could not hold down stable employment, and Dr. Nkangmiene gave her a note to that effect.  The doctor again described Cowgill as stable, having a full affect, exhibiting no evidence of agitation or involuntary movement, and having intact cognition, insight, and judgment.  Dr. Nkangmiene increased Cowgill's dosage of Lamictal.

On February 28, 2007, Dr. Nkangmiene described Cowgill as doing well.

Cowgill reported on March 29, 2007, that she was unable to stay asleep.  Tr. at 215.  Dr. Nkangmiene's notes from that day, however, also note that Cowgill was happy, her sleep and appetite were good, and that she was satisfied with current medications.  The doctor again described her as stable, having a full affect, exhibiting no evidence of agitation or involuntary movement, and having good cognition, insight, and judgment.  The doctor noted that he would prescribe Ambien.

On April 30, 2007, Cowgill reported feeling better with less depression and anxiety.  Tr. at 214.  Cowgill again reported sleep problems and described her appetite as fair.  The doctor found cognition to be fully intact, but described insight and judgment as only fair.  Dr. Nkangmiene replaced Ambien with Lunesta.

On May 29, 2007, Cowgill reported frequent headaches, although she denied depression or anxiety.  Tr. at 213.  Cowgill also reported daylong tiredness and some decrease in appetite, although she stated that these symptoms may have been the result of the hot weather.

7

On August 6, 2007, Dr. Nkangmiene found Cowgill to be stable, and discontinued Xanax because of possible side effects. Tr. 211-12.

Cowgill complained on March 10, 2008 of depression, tearfulness, increased irritability, and anxiety. Tr. at 209. Cowgill reported that she was sleeping well, although Dr. Nkangmiene was concerned that she might be getting too much sleep. Cowgill had recently given birth, and her boyfriend had left her.

On August 13, 2008, Cowgill reported that she had reduced her use of Xanax in March so she could hear her baby at night. Tr. at 208. Now, however, she complained of being too anxious. Dr. Nkangmiene prescribed Xanax, Wellbutrin, and Lamictal.

On September 10, 2008, Cowgill again reported anxiety, although it had improved since her last visit. Tr. at 207. She also reported loss of appetite and crying spells.

On October 21, 2008, Dr. Nkangmiene completed a Mental Residual Functional Capacity Questionnaire assessing Cowgill. Tr. at 224-28. Dr. Nkangmiene reported seeing Cowgill monthly beginning February 1, 2006. He diagnosed Cowgill as suffering from a major depressive disorder with recurrent episodes with an unspecified personality disorder. Cowgill was prescribed Xanax, Welllbutrin, and Lamictal, and this reduced her depression. However, her medications resulted in a loss or energy and appetite and caused frequent headaches. When asked to describe the clinical findings the demonstrate the severity of Cowgill's mental impairment and symptoms, Dr. Nkangmiene reported depression, no energy, no appetite, frequent headaches, difficulty focusing and concentrating, lacking motivation except with respect to her children, mood swings, and manic episodes. Dr. Nkangmiene's prognosis was "fair."

When asked to identify Cowgill's signs and symptoms on a checklist, Dr.

Nkangmiene checked anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; blunt, flat or inappropriate affect (adding "sometimes" in parentheses); feelings of guilt or worthlessness; impairment in impulse control ("sometimes" in parentheses); poverty of content of speech ("sometimes"); generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; psychomotor agitation or retardation; pathological dependence, passivity or aggressivity; persistent disturbances of mood or affect; change in personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness ("sometimes"); recurrent obsessions or compulsions which are a source of marked distress; seclusiveness; emotional withdrawal or isolation; bipolar syndrome; intense and unstable interpersonal relationships and impulsive and damaging behavior; disorientation to time and place ("sometimes – late" in parentheses); perceptual or thinking disturbances ("sometimes"); hallucinations or delusions ("sometimes"); hyperactivity ("sometimes"); catatonic or other grossly disorganized behavior ("disorganized behavior" was underscored); emotional lability; flight of ideas; manic syndrome ("sometimes – usually at night"); deeply ingrained, maladaptive patterns of behavior ("sometimes"); loosening of associations; illogical thinking ("sometimes"); vigilance and scanning; pathologically inappropriate suspiciousness or hostility; easy distractibility; autonomic hyperactivity; memory impairment; sleep disturbance; oddities of thought, perception, speech or behavior; and persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation.  Tr. at 225-26.

The Mental Residual Functional Capacity Assessment also included a checklist

assessing Cowgill's capacity with respect to the mendtal abilities and aptitudes needed to do unskilled work.  Dr. Nkangmiene indicated that Cowgill was limited but satisfactory with respect to abilities to understand and remember very short and simple instructions and to carry out very short, simple instructions.  He also indicated that she was seriously limited, but not precluded with respect to: remembering work-like procedures; maintaining attention for two-hour segments; sustaining an ordinary routine without special supervision; making simple work-related decisions; and carrying out detailed instructions.  He checked Cowgill as unable to meet competitive standards with respect to maintaining regular attendance and being punctual within customary, usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; asking simple questions or request assistance; responding appropriately to changes in a routine work setting; dealing with normal work stress; being aware of normal hazards and taking appropriate precautions; understanding and remembering detailed instructions; setting realistic goals or making plans independently of others; dealing with the stress of semiskilled and skilled work; interacting appropriately with the general public; and maintaining socially appropriate behavior.  Finally, Dr. Nkangmiene opined that Cowgill had no useful ability to function with respect to working in coordination with or proximity to others without being unduly distracted; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; traveling in unfamiliar places; and using public transportation.  Tr. at 226-27.

At the conclusion of the Mental Residual Functional Capacity Assessment, Dr.

Nkangmiene asserted that Cowgill did not suffer from reduced intellectual functioning but that her psychiatric condition exacerbated her headaches.  He opined that Cowgill would miss work more than four days per month because of her impairments or treatment, that her impairments could be expected to last at least twelve months, that Cowgill was not a malingerer, and that her impairments were reasonably consistent with the symptoms and functional limitations he listed in this report.  Dr. Nkangmiene noted that Cowgill had not received any job training and had no work experience.  Finally, he opined that Cowgill could not manage her own benefits and noted that her aunt managed Cowgill's money.  Tr. at 228.

C.   *Hearing testimony*

At her hearing, Cowgill testified that although she had looked for work, she had never held a job.  Tr. at 10.  She did not have a driver's license because the thought of driving frightened her.  Tr. at 11.  According to Cowgill, her aunt came over every day to help take care of the children and help with household chores.  Tr. at 11-12.  Cowgill testified that her aunt helps because sometimes Cowgill is incapable of doing these things.  Tr. at 11.  Her aunt also brings her to her appointments with Dr. Nkangmiene.  Tr. at 13.  Cowgill testified that on a typical day she awakes and wakes her daughter, and then her aunt comes to her home.  The aunt puts the daughter on the bus, helps with the chores and helps get the baby dressed.  Cowgill and the aunt go to the store or pay bills, then Cowgill gets her daughter from the bus and helps with homework.  Tr. at 13-14.  She did not usually go to the store by herself.  Tr. at 14.

Cowgill also testified that on bad days she did not usually get out of bed and did not get dressed.  On those days, her aunt did all the child and household chores.  Tr. at 15.

This happens, according to Cowgill, once or twice a week.  Tr. at 15.  Cowgill asserted that she had anxiety attacks a couple times a day, each lasting a couple of hours.  Tr. at 16.

Cowgill ascribed her inability to work to not being able to deal with people.  Tr. at 16.  She also testified that she had serious problems with concentration and that her aunt took care of remembering medications and appointments for her and her children.  Tr. at 15-17.  Cowgill asserted that with the exception of her aunt, she was unable to get along with others and that her interactions degenerated into arguments with screaming, yelling, and crying.  Tr. at 18.  About three years previously, Cowgill began working toward her GED.  It took two to three years, and she had to take the test twice.  Tr. at 19.

The ALJ asked the VE to assume an individual with a GED; aged 24; with no exertional limitations; limited to performing simple instructions; routine or repetitive tasks; low stress work with no high production or rapid production quotas; no face-to-face interaction with members of the general public; occasional face-to-face interaction with co-workers and supervisors; no concentrated exposure to temperature extremes, fumes, odors, dusts or gases; no exposure to unprotected heights; and no driving.  Tr. at 20-21.  When asked if there were jobs for such an individual, the vocational expert testified that the individual could perform such jobs as housekeeping cleaner, laundry laborer, and vending attendant and that these jobs existed in significant numbers in the regional and national economy.  Tr. at 21.

When Cowgill's attorney examined the VE, he asked if an individual with the limitations described in Dr. Nkangmiene's October 21, 2008 opinion could perform substantial work in the national economy.  The VE testified that there would not be any work for such an individual.

12

III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

The ALJ made the following relevant findings:

1. The claimant has not engaged in substantial gainful activity since February 28, 2006, the application date.

2. The claimant has the following severe impairments: a personality disorder and a bipolar disorder.

3. The claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple instructions, routine or repetitive tasks; low-stress work with no high production or rapid production quotas; no face-to-face interaction with members of the general public; only occasional face-to-face interaction with co-workers and supervisors; avoidance of concentrated exposure to temperature extremes, fumes, odors, dusts or gases; avoidance of unprotected heights; no driving for work purposes; and no working directly and sustainedly with others.

5. The claimant has no past relevant work.

6. The claimant was born on May 2, 1984 and was 21 years old, which is defined as a younger person, on the date the application was filed.

7. The claimant has at least a high school education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 28, 2006, the date the application was filed.

Tr. at 49-54 .

The ALJ gave greater weight to the opinion of Dr. Haude, the examining phsyician,

14

than to the opinion of Dr. Nkangmiene, Cowgill's treating physician. In rejecting the opinions of Dr. Nkangmiene regarding Cowgill's limitations, including an inability to function and inability to sustain stress and maintain attention, the ALJ found that Dr. Nkangmiene's opinions contradicted: (1) Cowgill's reports of her daily activities, (2) his own findings resulting from his mental status examinations, and (3) the findings of other examining specialists in mental health. *Inter alia*, the ALJ cited Cowgill's completion of her GED since her last application for SSI as contradicting Dr. Nkangmiene's opinion. She also noted that Dr. Nkangmiene relied largely on statements made by Cowgill and her mother. In addition, she observed that Dr. Nkangmiene's opinion regarding Cowgill's employability was beyond his area of expertise. The ALJ found the assessment of Dr. Haude to be more consistent with the record as a whole. For this reason, the ALJ found Cowgill's symptoms top be less severe and limiing than alleged and found that they would not preclude Cowgill from performing work on a regular and sustained basis.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

15

preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

Cowgill alleges that the ALJ erred by failing to accord controlling weight to the opinion of Dr. Nkangmiene. The Commissioner denies that the ALJ erred.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

In the instant case, the ALJ correctly observed that Dr. Nkangmiene's conclusions regarding Cowgill's limitations were based on the subjective reports of Cowgill and her

mother. He also observed that Cowgill's successful completion of a GED apparently contradicted her claims as to the extent of her limitations, as did Dr. Nkangmiene's own treatment notes and the opinions of the examining and non-examining physicians. As insufficient objective data supported Dr. Nkangmiene's opinion and it was contradicted by other evidence in the record, the ALJ did not err in choosing to disregard Dr. Nkangmiene's opinion. Consequently, there is substantial evidence in the record to support the administrative law judge's findings of fact.

## VII.  Decision

For the reasons given above, the court **AFFIRMS** the opinion of the ALJ and dismisses the complaint with prejudice.

**IT IS SO ORDERED.**


Date:  June 30, 2011            s/ *Nancy A. Vecchiarelli*
                                U.S. Magistrate Judge